IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

LORRAINE LETTIERI,                )
                                  )
        Plaintiff,                )
                                  )
            v.                    )      1:04cv838 (JCC)
                                  )
EQUANT, INC.,                     )
                                  )
        Defendant.                )

**M E M O R A N D U M    O P I N I O N**

This matter is before the Court on Defendant's motion
for summary judgment.  Plaintiff Lettieri filed this Title VII
and breach of contract suit against Defendant Equant, her former
employer.  For the reasons stated below, the Court will grant
Defendant's motion for summary judgment on all counts.

**I. Background**

Plaintiff Lorraine Lettieri, a female, worked for
Global One as Director of Alternate Sales Channels from mid-2000
to June 2001 when Global One merged with Defendant Equant, Inc.,
("Equant,") an international telecommunications firm.  The
resulting company was called Equant.  Global One was also a
telecommunications company.  There, Lettieri had managed a
nationwide team of approximately 14 sales professionals.  She
lived in New York City with her husband and two children.  She

spent about half of each month traveling to the Global One office in Reston, Virginia and client sites nationwide.

At the time of the merger, Equant had considerable dealings with Sprint International, ("Sprint,") which re-sold Equant's network data services to Sprint's own customers. Lettieri had negotiated the original relationship between Sprint and Global One, and had extensive knowledge of Equant's dealings with Sprint.  Following the merger, Lettieri and Global One's Sprint sales team joined Equant in an indirect sales channel at Equant called the Sprint Channel.

Equant contemplated organizing the Sprint Channel into a free-standing profit and loss, ("P&L,") business unit.  This required a restructuring of Equant and creation of a new position called "Head of Sprint Channel" to coordinate the dealings between Equant and Sprint.  Equant Vice President Sean Parkinson considered Lettieri and Michael Taylor, an Equant Sales Manger with over 23 years of management experience within the telecommunications industry and many years of P&L experience, for the job.  Lettieri alleges that during her July 2001 interview for the position, Parkinson spent most of the interview asking how Lettieri's husband "tolerated" her absences from New York. After the interview, Lettieri complained to her immediate supervisor James Hamrick about Parkinson's questions.  Hamrick advised her to talk to Equant's human resources department, so

-2-

she complained to Lauren Stoll, Equant's Human Resources representative.

Parkinson subsequently recommended Taylor for the position.  Parkinson claims that he based his recommendation on several factors, including that Taylor had P&L experience whereas Lettieri had none, and Taylor was already familiar with Equant's business model and objectives and was not closely tied to the incoming sales team or Sprint.  Lettieri alleges that Parkinson told her that she was more qualified than Taylor for the position, but that Taylor's children were raised and on their own, so he did not have family obligations of the sort that Lettieri had as a mother.  Lettieri also claims that Parkinson said she would have to train Taylor for the position.

Taylor became Head of Sprint Channel in Summer 2001. Lettieri remained Director of Sales and began reporting to Taylor, whom she also assisted in understanding Sprint's needs. Lettieri claims that Taylor made derogatory and offensive comments about and to women.  He allegedly called or referred to Lettieri and another female manager, Laure Travers, as "stupid bitches" in Fall 2001.  He commented that he had no use for Travers other than using her French charms on the customer. Taylor said that he wished Travers worked in Reston so she could make photocopies for him despite the fact that Travers had a high level managerial position in the company.  Lettieri testified

that Taylor told her on two occasions between July and December 2001 that she should consider being back in New York with her family.[1]  (Pl.'s Opp'n, Ex. 2 at 259-60).  In Fall 2001, Lettieri claims that she contacted Imani Dawson, Equant's Human Resources representative regarding, *inter alia*, Taylor's treatment of her in the workplace.

Equant claims that with Taylor as Head of Sprint Channel, Lettieri at first was helpful and hard working, but then began to resist integrating into Equant and accepting its business model.  Taylor believed that Lettieri did not appreciate Equant's financial model, which could not always accommodate the pricing that Sprint wanted.  In October 2001, Taylor told Lettieri to "stop taking Sprint's side and to think more about Equant." (*Id.* at 233-34).  Lettieri responded that she was thinking of Equant.  (*See id.*)

Following the merger, Equant realized that it had overestimated the revenue it would derive from Sprint and the relationship between the two companies deteriorated.  During the Global One days, the Sprint sales team interfaced directly with Sprint's sales team and with Sprint customers.  However, Sprint no longer wanted the Sprint Channel to interface directly with its sales team or Sprint's customers.

---

[1] The first occasion was when her mother was ill and in a nursing home; the second was when there was a meeting in Reston and Taylor told her to stay in New York.

-4-

In early December 2001, Taylor asked Lettieri to recommend restructuring plans for the Sprint Channel. Before Lettieri responded, on December 17, 2001, Taylor emailed Lettieri his own proposal which included changes to Lettieri's responsibilities. Lettieri considered the proposed changes a demotion and contacted Jill Hausner with Equant's Human Resources Department to complain that Taylor's actions indicated his bias against her as a woman. She also told Hausner about the inappropriate questions Parkinson asked during her interview for the Head of Sprint Channel position.

Hausner then contacted Taylor; her notes from their conversation indicate that she specifically asked him about the "discrimination issue." (*See* Pl.'s Opp'n, Exs. 9, 10). She also contacted Parkinson who was surprised that Lettieri thought that any of the questions he asked during the interview were inappropriate. (Pl.'s Opp'n, Ex. 10 at 22-25). Hausner then spoke with Lettieri and told her that Lettieri and Taylor needed to communicate more about her position within his organization. (*Id.* at 26-28). Hausner testified that Lettieri did not complain of gender issues during the second conversation. (*Id.* at 27).

Taylor believed that Lettieri's proposed duties would ultimately increase revenue for the Sprint Channel by focusing her directly on large accounts. (*See* Def.'s Mot., Taylor Dep. at 98-99). Lettieri emailed Taylor on December 18, 2001 stating

-5-

that the proposed changes were "totally unacceptable." (*See* Piesco Decl., Ex. 3).  Taylor's proposal was not implemented.

During the first two quarters of 2002, Equant's revenue fell short of its forecasts.  It had to reduce costs and eliminate redundant and/or unnecessary positions to meet earnings targets.  In or around February 2002, Parkinson initiated discussions with Richard Blaustein, Head of North American Markets and Sales, regarding the Sprint Channel, including the possibility of terminating Lettieri's position.  Taylor agreed that Lettieri's position could be eliminated.  On March 31, 2002, Lettieri sent an email to Equant senior management on behalf of herself and the members of the Sprint Channel Team that was critical of Equant and a proposed compensation plan.  (*See* Def.'s Mot., Bird Dep., Ex. 2).  On April 18, 2002, Lettieri sent an email to Taylor criticizing the "strong-armed tactics" of Parkinson and boasted that there was "no one in the entire Equant sales group" that could "shine [a Sprint Channel team member's] shoes."  (*See* Piesco Decl., Ex. 6).

In April 2002, Parkinson; Paul Radochia, Taylor's direct supervisor; James Radcliffe, Equant's Head of Sales Operations; Taylor; and Fran Bird, Equant's Head of Region Human Resources, North America, expressed concern about Lettieri.  (*See* Def.'s Mot., Radochia Decl., Ex. 4).  In May 2002, Taylor called a meeting of the Sprint Channel regarding the need to "do more to

-6-

control our revenue and expenses." (*See id.*, Ex. 6).  Lettieri sought to have the meeting rescheduled because three members of the team, including herself, were scheduled to be on vacation. (*See id.*)  Radochia responded that "[g]iven the magnitude of the situation, with revenue shortfall and major billing problems on the Sprint accounts, combined with the timetables, it is not too much to ask of you and the other two on your team to take 20 minutes out of your vacation to deal with this."  (*Id.*)

On June 14, 2002, Taylor told Radochia via email that he "had [his] eye on [a male] as possible sales leadership replacement to [Lettieri] for some time."  (Pl.'s Opp'n, Ex. 13).  Radochia responded that the male was a poor choice and that since Lettieri was "on the redundant list . . . on [his] headcount proposal," she could not be replaced for at least six months. (*Id.*)

In Spring and early Summer 2002, Equant's revenue continued to decline.  It issued the North American Markets Headcount Plan on July 3, 2002 which included a directive to "further reduce management where possible."  (*See* Def.'s Mot., Bird Dep., Ex. 1).

In or about June 2002, Equant decided to eliminate Lettieri's position, which was deemed unnecessary and redundant. On July 8, 2002, Equant terminated Lettieri.  Following the elimination of Lettieri's position, Equant claims that the Sprint

Channel sales team reported directly Taylor, who assumed Lettieri's duties in addition to his own.  (*See* Def.'s Mot., Taylor Dep. at 145-164).  Equant claims that Lettieri's position was eliminated.

Lettieri alleges that her work situation rapidly and dramatically deteriorated after she complained to Hausner in December 2001.  In January 2002, Taylor terminated Lettieri's signature authority for expense reports.  In March 2002, Taylor took over the Special Pricing Process which Lettieri had developed with Sprint.  Lettieri alleges that Taylor stopped communicating with her in regard to business decisions, started verbally abusing her in private and in front of other members of her staff, once calling her a "bitch" and a "lazy fat ass" in Spring 2002.  In March 2002, he failed to give her an annual review or performance review that she claims she was entitled to receive.

Lettieri claims that when Taylor met with her on July 8, 2002, he told her that she looked "pretty in pink" and "very girlish," then terminated her employment.  On the same day, Taylor also terminated Travers.  Taylor and Travers were the only two managers of the Sprint Channel at the time.  Lettieri claims that she was terminated because of Taylor's gender discrimination against her as a competent, independent woman and in retaliation for complaining to Hausner.  Lettieri claims that she was

replaced by Gregory DeMarco as Director of Sprint Channel, which was the same position held by Lettieri when she was terminated. DeMarco then allegedly contacted Lettieri, asked how to do the job, and told her that Equant management said she knew how to do the job better than anyone else.  (Pl.'s Opp'n, Ex. 2 at 476). Equant later terminated Taylor and Lettieri secured a job at Sprint.

Following her termination, Lettieri sought payment of approximately $50,000 in commissions to which she claims she was entitled under the terms of her employment agreement with Equant. Equant has refused to pay the commissions.

Lettieri timely filed a charge of discrimination with the Equal Employment Opportunity Commission, ("EEOC").  Within 90 days of receiving a right to sue letter from the EEOC, on July 20, 2004, Lettieri filed this suit against Equant alleging the following counts: (1) Title VII gender discrimination; (2) Title VII retaliation; and (3) breach of contract.  Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1367(a) (2005).  On March 11, 2005, Equant filed a motion for summary judgment on all counts.  This motion is currently before the Court.

## II. Standard of Review

Summary judgment is entered when a plaintiff "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party
will bear the burden of proof at trial." *Stone v. Liberty Mut.
Ins. Co.*, 105 F.3d 188, 190 (4th Cir. 1997)(quoting *Celotex Corp.
v. Catrett*, 477 U.S. 317, 322 (1986)).  "To prevail on a motion
for summary judgment, a party must demonstrate that: (1) there is
no genuine issue as to any material fact; and (2) it is entitled
to judgment as a matter of law." *Id.* (citing *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  A genuine issue of
material fact exists "if the evidence is such that a reasonable
jury could return a verdict for the non-moving party." *Anderson*,
477 U.S. at 248.

Once a motion for summary judgment is properly made and
supported, the opposing party has the burden of showing that a
genuine dispute exists. *See Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The party
opposing summary judgment may not rest upon mere allegations or
denials; a "mere scintilla" of evidence is insufficient to
overcome summary judgment. *Anderson*, 477 U.S. at 248-52.
Unsupported speculation is not enough to withstand a motion for
summary judgment. *See Ash v. United Parcel Serv., Inc.*, 800 F.2d
409, 411-12 (4th Cir. 1986).  When a motion for summary judgment
is made, the evidence presented must always be construed in the
light most favorable to the nonmoving party. *See Smith v. Va.
Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996)(en banc).

## III. Analysis

### A. Gender discrimination

Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, makes it "an unlawful employment practice for an employer . . . to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).

As set forth in *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, a plaintiff may:

> proceed under a "pretext" framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination.  To demonstrate the prima facie case of sex . . . discrimination under the pretext framework, the plaintiff must show that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.  If a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Assuming the employer meets this burden of production, . . . the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons "were not its true reasons, but were a pretext for discrimination."  At this point, the burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination."

354 F.3d 277, 285-86 (4th Cir. 2004)(citations omitted).

The plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *See Tx. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973)). However, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Hill*, 354 F.3d at 286 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)).

Lettieri claims that her claim should survive under the pretext framework because she can establish a prima facie case, and although Equant has presented a legitimate, non-discriminatory reason for the termination, there is substantial evidence of pretext. Of the four elements of a prima facie case, only the fourth, whether the position remained open or was filled by similarly qualified applicants outside the protected class, is in dispute. Lettieri claims that she has met the fourth prong because she was ultimately replaced by DeMarco, a male. Equant claims that her position was eliminated and she was not replaced.

Equant explains that Bruce Smith replaced Blaustein as Head of North American Markets and Sales shortly after Lettieri's July 8, 2002 termination. Seven months later, Smith hired

-12-

Barbara Wellons to take over Radochia's role.  Taylor began
reporting to Wellons, who reported to Smith.  In April 2003,
Wellons requested that Taylor tender his resignation, which he
did.  Wellons then hired DeMarco, who, like Taylor, reported to
Wellons and was reported to by the sales team.  (Def.'s Reply at
13).  The management team of Parkinson, Blaustein, Radochia, and
Taylor made the decision in 2002 to terminate Lettieri.  Because
a completely different management team hired DeMarco, the
subsequent actions by these different decision-makers cannot be
imputed back to Parkinson, Blaustein, Radochia, and Taylor.  *See
generally Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 474 (6th
Cir. 2002).

        Moreover, although she and DeMarco both held the title
"Director" within the Sprint Channel, the title says nothing
about the daily job duties of DeMarco as compared to the duties
of Taylor or Lettieri.  *See McGovern v. Transamerica Ins. Fin.
Corp.*, 854 F. Supp. 393, 399-400 (D. Md. 1993)(citing
*English v. Pabst Brewing Co.*, 828 F.2d 1047 (4th Cir. 1987)).
That DeMarco was a Director does not prove that he replaced
Lettieri and Lettieri has provided no evidence that DeMarco's
position required the same skills and expertise as the position
held by Lettieri.

        As for Lettieri's allegation that DeMarco called her
for advice on how to do his job, Equant argues that DeMarco's

statements to Lettieri are hearsay and inadmissible.  However, even if admissible, the statements do not provide evidence that DeMarco replaced her.  Taylor assumed Lettieri's duties upon her termination.  Thus DeMarco would have also assumed some of Lettieri's duties when he replaced Taylor.  Lettieri provides no evidence of DeMarco's daily duties at Equant so she has not shown that he replaced her.  In fact, the evidence shows that her position was eliminated.  Thus Lettieri has not met the fourth prong of the prima facie test, and the Court will grant Equant's motion for summary judgment on Count I, the discrimination claim.[2]

## B. Retaliation

The test for proving prima facie retaliatory discharge under 42 U.S.C. § 2000e-3(a) requires that: (1) plaintiff engaged in protected activity; (2) the employer took adverse employment action against plaintiff; and (3) a causal connection existed between the protected activity and the adverse action.  *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998).  To meet the third requirement, the plaintiff must show that the adverse action

---

[2] The Court notes that even if Lettieri had made a prima facie case, she has not shown that a genuine issue of material fact exists as to whether she was the victim of intentional discrimination.  The "stupid bitch" remarks that Taylor allegedly made to her do not provide evidence of discriminatory intent because Lettieri has produced no evidence that these remarks were related to the decision to fire her.  "Mere stray remarks unrelated to the decision making process at issue . . . are not evidence of discrimination." *Green v. Fairfax County Sch. Bd.*, 832 F. Supp. 1032, 1039 (E.D. Va. 1993)(Hilton, J.)(citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)).

would not have occurred "but for" the protected conduct. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365-66 (4th Cir. 1985)*(overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).  Once the plaintiff establishes the elements of her prima facie case, the burden shifts to the employer to proffer evidence of a legitimate, non-discriminatory reason for taking the adverse employment action. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2001)(citation omitted).  If the employer carries its burden, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered" were pretextual. *Id.*

Equant alleges that Lettieri cannot meet the third requirement because: (1) there is no temporal nexus between her December 2001 complaint and the elimination of her position seven months later; and (2) Lettieri has not presented specific evidence upon which a jury could find a causal nexus between her termination and any alleged complaint of discrimination.  Equant also argues that even if Lettieri could establish a prima facie case of retaliation, it has provided evidence of Equant's non-discriminatory reasons for eliminating Lettieri's position.

To make out a prima facie case, Lettieri alleges that she engaged in protected activity when she complained of gender-based issues and discrimination to Hausner; she suffered an

adverse employment action, i.e. termination; and there is a sufficient causal connection between the two.  Lettieri alleges that she complained to Hausner about Parkinson and Taylor on December 17 and 19, 2001, and that by February or March 2002, Parkinson and Taylor "were coordinating about [Lettieri's] termination."  (Pl.'s Opp'n at 29 (citing Ex. 11 at 12)).  However, the part of Parkinson's deposition cited by Lettieri simply explains that in February/March 2002, he was discussing with Blaustein about downsizing and terminating Lettieri and Travers because of the lack of productivity in Sprint Channel.  (*Id.*)

Equant argues that Taylor was not informed that Lettieri had lodged a discrimination complaint.  Equant maintains that Hausner only told Taylor that Lettieri had made general assertions about bias against women at Equant.  However, Hausner's notes from her conversation with Taylor indicate that she specifically asked him about the "discrimination issue." (*See* Pl.'s Opp'n, Ex. 9, 10).  Construing the facts in the light most favorable to the Plaintiff, the Court must infer that Hausner told Taylor that Lettieri had complained about perceived gender discrimination.

However, Lettieri cannot show the requisite causal connection between her December 2001 complaints and her July 8, 2002 termination.  Taylor testified that in Summer 2001 he became

aware of problems Lettieri and her former Global One team were having in integrating into Equant and accepting its profit-oriented business model. (Def.'s Mot, Taylor Dep. at 79-80). He further testified that Lettieri never adjusted to the way Equant did business, such as Equant's pricing mechanisms and how the work force needed to be realigned to meet the needs of the business. (*Id.* at 84-91). In November 2001, Parkinson and Taylor thought that Lettieri was not doing a good job as a manager and "had more of the team environment [sic] that she was one of them and she had to fight the management to get what was right for them." (Def.'s Mot., Parkinson Dep. at 36-37). Parkinson thought that as a manager, you needed to make yourself "slightly aloof to your team members so they will see you as a leader and not one of the team. You have to voice from a management perspective of what is right for the business, not what is right for each individual." (*Id.*)

Although Radochia testified that there was no threat of terminating any Sprint Channel employees in 2001, (Piesco Decl., Ex. 1-B at 48), he also stated that Sprint Channel revenue was less than expected in 2001 and 2002. (*See id.* at 24-25, 64-65; Def.'s Mot., Radochia Decl. ¶ 7). In Summer and Fall 2001, Taylor assessed Equant's relationship with Sprint and determined that it was a negative relationship. (*See* Piesco Decl., Ex. 1-C

at 29-30).  In Winter 2001, Taylor's activities as Head of Sprint

Channel were:

> dominated by financial accounting issues justifying the
> billing discrepancies and the revenue discrepancies,
> subsequent compensation issues among the Equant team
> that would fall out of that, expense management, where
> were we spending money in my direct report area, and
> how were we staffed properly elsewhere in the
> corporation to support the volumes or lack of volumes
> that we were encountering.

(*See id.* at 33-34).

Taylor took on the task of reorganizing the Sprint

Channel to meet Sprint's business needs and stop further revenue

losses.  (*See* Piesco Decl., Ex. 1-B at 43-45).

It was only after receiving Taylor's email proposing a

change in her responsibilities that Lettieri engaged in protected

activity and complained to Hausner.  (*See* Pl.'s Opp'n, Ex. 8).

At the end of his email, Taylor suggested that he and Lettieri

discuss his proposal.  (*Id.*)  However, Lettieri immediately

responded that his "organizational recommendations for [her were]

totally unacceptable," and that she would discuss with HR and her

attorney before having any further conversations in this area.

(*Id.*)

In or around February 2002, to deal with falling

revenue, Parkinson initiated discussions with Blaustein regarding

the Sprint Channel, including the possibility of terminating

Lettieri's position.  Taylor agreed that Lettieri's position

could be eliminated.  In March and April 2002, Lettieri sent

emails to Equant senior management that were critical of Equant. (*See* Def.'s Mot., Bird Decl., Ex. 2; Piesco Decl., Ex. 6).  In April 2002, Parkinson, Radochia, Radcliffe, Taylor, and Bird expressed concern about Lettieri.  (*See* Def.'s Mot., Radochia Decl., Ex. 4).

The record shows that senior management had begun to find fault with Lettieri's management style as early as November 2001.  It was Taylor's proposal to change her duties that prompted her to complain about alleged discrimination.  His proposal shows that before she engaged in protected activity, he already wanted to change her duties to increase revenue.  She perceived the proposed changes to be a demotion and reacted strongly against Taylor's proposal.  In February 2002, Equant's senior managers were discussing options for dealing with falling revenue, including terminating Lettieri and her position.  The content and tone of her emails indicate that Lettieri was critical of Equant management and at times difficult to work with.  The record shows that Equant managers were aware of the problems with Lettieri and discussing ways to remedy that problem before she complained to Hausner.  Lettieri became increasingly critical and hostile after she complained.

Lettieri has provided only her conclusory statements that she was ultimately terminated in retaliation for her complaints to Hausner in December 2001.  However, unsupported

-19-

speculation is not enough to withstand a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).  Lettieri has failed to show that a causal relationship exists between her complaints and her ultimate termination.  Accordingly, Lettieri has failed to make a prima facie case for retaliation, and the Court will grant Equant's motion for summary judgment on Count II, the retaliation claim.

## C. Breach of contract

In Virginia, the elements of a breach of contract action are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)(citations omitted).  Equant argues that Lettieri has not shown that Equant failed to perform its obligations under the contract at issue, the Sales Compensation Plan ("the Plan").

Equant does not dispute that its written Sales Compensation Plan entitled Lettieri to commissions from her work at Equant.  Equant does however dispute whether Lettieri is entitled to further commissions: (1) for the UPS account and revenue; or (2) to reflect the reduction in the revenue quota for the Sprint Channel that occurred after she was terminated but was retroactive to January 1, 2002.

In 2002, Lettieri was assigned a revenue quota of $171 million, an order quota of $160 million, (*see* Def.'s Mot., Dale Decl., Ex. 1), and a target variable salary of $36,725. (*See* Def.'s Mot., Dale Decl. at ¶ 5)  Upon achieving a certain percent of her quota, Lettieri would receive a certain percent of her target variable salary as a commission. (*See* Def.'s Mot. ¶ 61). A section of the Sales Compensation Plan Administration Guide titled "Joining and Leaving the Plan" states:

> For terminations or transfers out of the plan, the effective date will be on the last day of the month preceding the transfer or termination unless otherwise specified by HR.  If the effective date is not the last day of the month, the monthly billed revenue will be prorated through the date of transfer or termination. Prorated revenue will be calculated by dividing the # of days in the month through the date of transfer or termination, including weekends and holidays, by the # of total days in the applicable month.

(Def.'s Mot., Dale Decl., Ex. 2 at 5).

Lettieri claims that she and her direct report within the Sprint Channel department, Philippe Jobard, won a contract with UPS for Equant under which Sprint would place $3.5 million in orders through Equant on behalf of UPS. (*See* Pl.'s Opp'n, Ex. 2 at 62-64).  In April 2002, Taylor assured Lettieri that Jobard[3] would receive commissions for the UPS account that Sprint won under the Plan. (*See* Pl.'s Opp'n, Ex. 15).  Lettieri claims that Equant did not decide that she was not due any commissions for

_____

[3] Lettieri claims that Taylor said that the *Sprint Channel* would receive commissions for the UPS account; however, Taylor actually said that *Jobard* would receive commissions. (*See* Pl.'s Opp'n, Ex. 15).

the UPS deal until she pursued this lawsuit.  Equant claims that
Lettieri received revenue credit for all reported UPS revenue for
January through March 31, 2002.  Equant explains that Jobard, in
dereliction of his duties, failed to submit an order detail for
the order credit on the UPS account during that period, so no
order credit could be given.  Finally, Equant claims that: (1)
there were no UPS orders reported by any members of the Sprint
Channel in 2002; (2) Jobard never submitted a bonus claim form in
2002; and (3) Taylor did not receive any order credit on the UPS
account in 2002 nor did he receive any revenue credit on the UPS
account after April 1, 2002.  (Def.'s Mot, Dale Decl. ¶¶ 9-10,
12).  Lettieri has not identified any agreement that entitles her
to commissions on the UPS order that was never reported to
Equant.  Thus, Lettieri has not created a genuine issue of
material fact as to whether Equant breached an obligation to pay
her those commissions.

In October 2002, Equant made a retroactive adjustment
of Sprint Channel's revenue quota for 2002 from $171 million to
$137 million, which made each individual's target more attainable
and made it easier for them to achieve commissions.  (*See* Pl.'s
Opp'n, Exs. 7 at 125-26; 18).  Equant explains that adjustments
made after an employee ceases employment and participation in the
Plan are not applied retroactively.  (Def.'s Mot., Radochia
Decl., Ex. 7).  Equant claims that since Lettieri was terminated

on July 8, 2002, she was not entitled to have the October 2002 reduction in revenue target applied to her retroactively.  Equant claims that the reduction also was not applied to reduce Taylor's revenue target and that his sales compensation for 2002 was calculated based on the original revenue target of $171 million. (Def.'s Mot., Dale Decl. ¶ 13).

Lettieri points to an email sent by Radochia to Jim Radcliffe implying that Radochia thought that the retroactive adjustment should have applied to Lettieri.  (*See* Pl.'s Opp'n, Ex. 18).  However, Radcliffe, whose job it was to administer the Plan, replied to Radochia and Hausner that because the adjustment was made after Lettieri left Equant, it did not apply to her. (*See* Def.'s Mot., Radochia Decl., Ex. 7).

It is clear that Equant fulfilled its contractual obligations regarding payment of commissions to Lettieri under the Plan.  No reasonable juror could conclude that Equant was obligated to pay the commissions that Lettieri now seeks. Accordingly, the Court will grant Defendant's motion for summary judgment on Count III, the breach of contract claim.

## IV. Conclusion

For the reasons stated above, the Court will grant Equant's motion for summary judgment on all counts.  An appropriate Order will issue.


April____, 2005
Alexandria, Virginia          _____
                              UNITED STATES DISTRICT COURT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

---

LORRAINE LETTIERI,                          )
                                            )
          Plaintiff,                        )
                                            )
               v.                           )     1:04cv838 (JCC)
                                            )
EQUANT, INC.,                               )
                                            )
          Defendant.                        )

## O R D E R

For the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

(1) Defendant's motion for summary judgment is GRANTED; and

(2) the Clerk of the Court shall forward copies of this Order and the accompanying Memorandum Opinion to all counsel of record.

This Order is Final.

April 21, 2005                    ___/s/ James C. Cacheris_____
Alexandria, Virginia             UNITED STATES DISTRICT COURT JUDGE